Thank you, Your Honor. May it please the Court, my name is Robert Amidon. That's spelled A-M-I-D-O-N for the benefit of the record. I'm here today with my colleague, Mr. Wayne Tobin, who assists me not only in what we affectionately call Medina 1, but also Medina 2. Medina 1 being the Orange County case, Medina 2 being the Riverside County case. And Brad, you can start the clock. There is an overlap in both cases, and I want to emphasize that coming right out of the shoot, if I may. However, as the Court knows, Medina 1 is a non-AEDPA case, and Medina 2 is an AEDPA case. Now, during both the guilt phase and the penalty phase, there's a matter of overlap. Evidence was introduced of the murder of Craig Martin in Riverside County on 10-19-84, including testimony by the county pathologist, testimony by the Corona police officer, and testimony by the ballistics expert. In Medina 2, as you'll learn, of course, the conviction in Medina 1 was introduced, as well as they went into detail in the two killings of Jose Ariza and Douglas Metal. So from that point of view, you'll find that the two overlap tremendously in that regard, notwithstanding the different statutory standards we've been faced with in briefings before the Court. Number two, as a matter of overlap, you'll find that in the Doug Metal killing, there was a Perrier bottle incident on 11-4-84 where Mr. Metal's boss, Angela Ramirez, testified in Medina 1. That's not relevant to any issue before us, is it? I mean, I gather that you have healthy suspicions about that evidence, but there's no issue before us that concerns it. I'm raising the overlap issue solely because of the different standards. No, I mean about the bottle. There's no issue before us concerning the bottle. Actually, there was an issue, but it wasn't part of the certificate of appealability. Right, right. And it wasn't one that you briefed either, or at least that we haven't granted a certificate on. Actually, we did brief it. We did brief the Perrier bottle at some length, et cetera, in that regard. We briefed it because of the horrible discrepancy between the defense and the prosecution expert that they couldn't explain why there were such glaring dissimilarities in connection with the fingerprint evidence between Junior Medina, the Petitioner, and the actual fingerprints that they lifted. So it was an issue we brought up. It was briefed both on direct and state habeas. However, it was not a part of the COA, even though we then briefed it and requested Well, counsel, it would be helpful to me if we would focus on the issues that were as to which the COA was granted. Presumably those are your strongest arguments for relief. That's correct. Those are the penalty phase, both mitigation and investigation. Again, there are other overlap issues, but I will pass them on, pass them by, unless there is a question from the panel wanting me to describe any other overlap issues. One of the other issues in front of the Court is Ryan V. Martinez, and perhaps the Court might wish to consider a remand to District Judge Liu for him to use the proper test that has now been announced by the U.S. Supreme Court, the substantial benefit test, et cetera, for the two IAC claims. I would like to hear about that argument either now or later. You choose. You might want to do the rest of your argument first, but within this 30 minutes, I'd like to hear about it. That's fine, Your Honor. I think the co-counsel was planning to bring that up a great deal in connection with Medina 2. But basically ---- But it's a much more difficult argument. Basically precluded, isn't it, with regard to Medina 2. So aren't we better off doing it this way? Well, in both Medina 1 and Medina 2, when Mr. Abzug was handling Medina 2, we both filed separately motions to the Court asking to stay the habeas proceeding because of his deteriorating inability to assist us at all. I had gone up to San Quentin on a number of occasions with both experts and paralegals, and we were unable at all to be able to get Mr. Medina to focus on any of the killings or any of the facts in that regard. In fact, we submitted our declarations from counsel and paralegals and from the experts that attended with us, and it was just impossible. I say deteriorating because it looked like he was able to assist maybe trial counsel much more so than he was able to assist any of the appellate counsel that had been assigned to him by both the state public defender as well as my office. We've just been unable to get him to assist us and focus on problems that would allow neurological testing to be done, et cetera. The testing that was ---- If you want to talk about that now, it would be helpful to me to know exactly what it is that's not in the record now that could have been. I understand there's a circularity. But in as a subject matter, I mean, what is there of nonrecord-based claims that he could have influenced? And it strikes me that among them might be the issues around the penalty phase in Medina I as to why things weren't put on, since Mr. Kramer said largely it was because of what your client allowed to be put on. I have no idea whether that's the kind of thing you're talking about or whether it's just more testing, although current testing, I'm not sure what the use of it is with regard to usefulness as to prior issues. So what are we talking about with some degree of precision? Yes, Your Honor. I think it's a combination of a number of issues. So I need to be a little spontaneous and a little conceptual at first. Let me just say that it is clear in the transcript, 1634 to 1637, that there was testimony that the Attorney General even brought out in their opening brief that the father, Mr. Medina, had hit and slapped Junior around quite a bit as a young man. There was an awful lot of testimony about him being in accidents and being behind doors. But we're still on Medina I. Well, in Medina I, didn't Judge Kreeber both file a declaration and give deposition testimony to the fact that Medina did not want to have any of his family members testify, that he was kind of obstructing any of the witnesses there from coming in to give mitigation testimony and finally relented and let the father come in. But by doing that, that necessarily precluded a lot of the testimony we're talking about right now, I mean, from coming in. And habeas counsel has done an able job of eliciting a lot more about Mr. Medina's upbringing, but Medina himself seems to have, and the district court credited now Judge Kreeber, seems to have himself blocked much of that. And it concerns me, I recall being reversed in Shiro v. Landrigan, because the client had said to his lawyer that, you know, I don't want this testimony. And so the lawyer abided by his counsel's wishes. Permit me to respond as follows, Your Honor. I appreciate the fact that we had done an enormous job on habeas corpus to investigate things that Attorneys Kreeber and Stone had not done. We also found that there was severe physical abuse from the parents, which Attorney Kreeber and Stone admitted in the record that they had no evidence in connection with child abuse. This Court is well aware of decisions that both from a mitigation point of view, whether it be from a sympathy point of view or not, that both mental illness and child abuse is an area of the law that you bring in front of the jury under all circumstances. And, yes, you are right with regard to the mental health issues. I mean, you have various issues with what they did, but this is not one of these cases where they didn't do anything. They did quite a lot, actually. But they don't have any of the child abuse evidence. And as I said, and as Judge Wardlaw said, I mean, the district court's analysis of the IAC claim in that regard was essentially that Medina did not have any evidence  He did not tell them. I understand you say they didn't ask as such, but he said otherwise. And moreover, he didn't want them putting on the stand or his family members. So I guess my question is, is this related to the riot issue or not, and how? In other words, is this one of the areas in which you need cooperation from Medina that you haven't gotten? Yes, very much so. In what way? Well, because the mother was already deceased. The aunt had died. His mother had been beaten by his father. His brother, John, diagnosed as a paranoid schizophrenic and so forth, committed suicide. There were people there that were not living members and relatives of the family. You had the two sisters of Mr. Medina who did testify. And you had his father, who at one point also testified in Medina 1, et cetera. But there were enormous amounts of background that we uncovered that, again, Attorney Kreeber has admitted on the record. Okay. But how does that lead to what you need from Medina that you don't have? Well, probably, first of all, from a mental illness point of view, all of the experts have testified that there's something wrong with Junior Medina. He has a broken brain. When I deposed Dr. Sharma, et cetera, I finally had him admit there's just something terribly wrong. All right. So let's assume we agree with that. What under what framework and do you, are you requesting relief? And what are you requesting? Is this, are you talking about the stay issue? Because if it's a stay issue, I don't see how staying the proceedings helps you. I guess that's what Judge Berzon is struggling with. Like, what do you want? I mean, what do you need to have done? Well, I would love to have a stay because it seemed that in the past when he was given medications, et cetera, he was much more lucid and would talk to people regarding the actual killings, the murders. But what is it you, so you want to go back and say more about the murders to reopen the guilt phase? What is it that you want from him? I would like to have a neurological examination to simply show that he has organic brain damage and has a frontal lobe damage. I've been asking for that for the longest time and have been denied. But I gather from what you're saying that primarily you aren't interested in getting information from him. Very much so. Okay. But that's, you've talked about organic brain examination. What information do you need from him that you can't get right now? Well, I'd like to have information what he knows about the beatings of his mother, the hanging of his grandmother, his relationship with his uncle. What do you mean the hanging of his grandmother? His grandmother was hanged by the family members, including his father being a part of it.  Where in the record is that? I don't remember that either. Yeah, I don't remember that in the record. Grandmother beat Ted Jr. with a knotted rope so badly that he had to miss school for two weeks. Grandma was hung from the tree and beaten by her parents. The men in the family would get drunk and come home and beat their wives. Oh, so they hanged the grandmother. Yeah, they did hang the grandmother. It is in the record. I'm not sure I can give you the precise. You mean they hung her until she died? Yes. And so her parents did. That's what you just read. Correct. In their presence. I'd like to be able to talk to him about these. Every time I've been. Did he say he's not on medication right now? He is not, in my opinion, on medication, but I do not know for sure. I do know that I've received recently some prison disciplinary reports. All right, so what do we do about Ryan V. Gonzalez? Are you arguing that it's strictly confined to AEDPA or not? I think we argue that the court has the power in non-AEDPA to be able to exercise discretion to stay habeas proceedings for whatever reason, whereas under AEDPA, it appears that the court needs to know what the substantial benefit is, et cetera. Of course, Judge Lee. He said we're in the first situation, and Judge Liu exercises discretion and decided against granting a stay. Why was that an abuse of discretion? It was an abuse because I think that medication would have allowed a period of lucid moments that we could conduct a proper habeas investigation with Mr. Medina, and every time he has fought to build. So are you suggesting some order? Have you ever asked for an order for mandatory medication? I think courts around the country have done that before. Well, of course they've done it, but usually it's behest of the government, not behest of the lawyer for the petition. Well, if I understand, if I understand the decision in Ryan correctly, apparently you cannot get such an order to assist you in your investigation unless there's some probability that he'll respond to medication and be able to help you. If I understand the decision correctly, it basically cuts off your right to be able to have a stay at all if he's never going to be able to be competent enough to be able to assist you in your investigation. I think in the past, all of the declarations. I'm sorry. I don't mean to interrupt, but I'm so as I understand it, you actually really want some kind of an order that would enable you to determine whether or not he would be able to assist you if he were given proper medication. That's correct. Not just given the proper medication. I think he's been given medication in the past. The record is full of tons of medication that have been prescribed to him since the early 70s when he was in the Arizona State Prison. And if you read the reports carefully, they seem to indicate that he was better at a time and was able to help, including trial counsel, Attorney Kreber and Mr. Stone, more so than he was on medication. And then when he would fight with the jailer to get off of medication, that's when he started to deteriorate to the point that he was just comatose with me and former counsel as well, trying to take people up with both lawyers and experts to discuss issues with him. But really, don't you have the essential facts right now? I mean, you've basically, you've told us that you've done a great deal of work and uncovered all these matters. You don't know what he's going to say. That's correct. I do not know. So that portion is speculative. You seem to have developed the facts upon which you would urge ineffective assistance of counsel for Philly to investigate. So how did Judge Liu abuse his discretion by saying, no, I'm not going to allow it? Well, he simply, in my opinion, he limited everything to just the ineffective assistance claims for both the issues on the penalty phase only and didn't for the competency, sanity, and other phases. And again, we've raised the issue in front of him. But you just said, and the record appears to reflect to me, that with regard to this one, necessarily, as an actual matter of fact, he seemed to have been competent. I mean, in terms of how he operated during the trial. I don't think so. I think that he's You just said so, actually. Well, he slipped in and out of being medicated and not being medicated. During the trial? Yes, at the time. I thought the problem was after the trial and before the other one. No, at some point, if I remember the trial record correctly, he got into a big fist fight with the sheriffs and turned the paper west. Well, he did. That's true. But that doesn't prove he wasn't competent to assist his lawyers. Well, no, but it was because of the medication at the time. And he wanted to go off of his medications because it caused severe health problems and depression on his part. And that's what you glean from the record. But you don't know that. Nor do you know from the record whether or not through a neurological examination that indeed he might have that organic brain damage, which means he should not, in fact, you know, be awarded the death sentence, et cetera, rather than ELWOP. Well, that's a later question, right, isn't it? I mean, that's a question of whether he's competent to be executed. I mean, one of the problems with doing the neurological test now with regard to his earlier competence is that it's 25 or 30 years later. So I don't know what it proves about whether he was competent then. No, I think the doctors that if I gave you a complete survey of all of the physicians that have seen him, 10 or 12, several of them have hinted at the fact that he should have been given a neurological exam. I think it would prove that. Well, I think it would prove that. But obviously, it's very important for the question of whether he can be executed. And again, so it seems to me that maybe what you want – okay. So maybe what you want is something that would happen if he were scheduled for an execution, then you would want to know whether he was competent or where – to what point his IQ had deteriorated. At that point. At this point, doing the exam now, which he refused to allow have happened in the number one trial, won't change the number one trial record. I do not know if the panel is aware of what happened in order to get any testing done for Junior Medina. They had to cement the table and lock up to the floor. They had to cement the chair to the floor. They had to cement his hands to the table in order for there to be three or four days' worth of psychological testing. That's just because they were afraid of his violent nature when he was not on medication. Now, assuming he were given psychotropic drugs and was then lucid for my type of questioning, et cetera, I maintain that that would help me do evidentiary leads. But if it didn't help him – Couldn't you make a motion, which as far as I know you haven't, for involuntary medication? No, I just made a – I just made a motion instead for a stay in order to be able to conduct this type of investigation. Well, even if the judge stayed it, how would you conduct this investigation? I would immediately contact other organizations like CAP and others to assist me with the doctors that they've used in the past with other clients and would go in and set up the testing at San Quentin. I probably need about three months to do that. This case has been sitting here now for, what, four years or so? I think maybe longer, to be precise. But I do know Judge Liu's last comment in his order in Medina 1 was that with respect to competency to be executed, that Ford v. Wainwright analysis comes a later day and that we would start really all over again from the state system and go up the chain and go over to the federal system and go up the chain with the fact that today he just doesn't understand why you would want to be killing him. And so with that regard, competency to be executed is perhaps going to draw out what I want to do anyway. So I'm not trying to – I'm trying to circumvent having to use that as the vehicle, et cetera, when in fact I'd like very much to be able to do it now. I think both counsel, including former counsel, submitted to the court. Ginsburg's son is saying, why can't you make that motion now? He's clearly not going to be scheduled for execution in the foreseeable future. I could. I could do that. I certainly could file a motion asking for the right to use psychotropic drugs that would allow me to assist him. But why not do it under the vehicle of the Ryan stay? If I were to do it under the vehicle of the Ryan stay, it would be totally futile. I don't know that it would be futile. I'm not a doctor in that regard. I would be relying on people who have experience in the field to be able to give him drugs that would allow me and an investigator and an expert to be able to question him. If it turned out that it was futile, that's the only way I would know that for a fact. Once he's been given the drug, I've never ever questioned him, to my knowledge, up in San Quentin at a time where he was on drugs so that I would see a more passive demeanor. On the other hand, every time I've been up there with people, he's become agitated and violent, et cetera, and that was a part of the declaration submitted for the purpose of staying the habeas until I could do that investigation. He is imposing in the sense that ---- Kagan. You do happen to know whether there's a whole protocol and in the statutes for determinations of competency pretrial, which includes sending him to these special institutions to determine his competency or whether he can be made competent. Does ---- would that be available now? Is that limited to pretrial determinations? I don't think so at this stage. I don't think I can use it. You think not. But you don't know. You've never looked into any of this, essentially. No. I haven't. And all I did was, based on the then-existing law in the Ninth Circuit, I think it was the Nash case, we filed motions to stay habeas in order to go in and conduct that investigation. And then everything was put on hold while the U.S. Supreme Court handled the Ryan case v. Martinez and then came down with its opinion, et cetera, and the substantial benefit test of which neither Judge Liu nor we have ever had a chance really to try to brief matters in front of Judge Liu or not. So I don't know, again, if a remand is even in the cards with you all. But I would certainly, again, argue that I'd like the opportunity to go in and do that but not have to do it under the issue of competency to be executed. You're down to about two minutes. Do you want to reserve some time for rebuttal? Yes, Your Honor. That would be fine. Very good. May it please the Court. Supervising Deputy Attorney General Holly Wilkins on behalf of the appellee respondent. Could you move the microphone up just a little bit? Thank you. Is that there? Yes. Initially, Your Honors, I did want to note that I am unaware of the Ryan v. Gonzales issue being before the Court in the Companion Riverside case. While there were motions to stay proceedings in both cases in the district court, I am unaware of even an uncertified issue being briefed in the other case. It was my understanding that the case applied solely to the Orange County case we are arguing now. Okay. Well, why don't you address the Ryan issue first? Certainly, Your Honor. And, again, as will be ---- We'll bear that in mind in the next case. Well, as made clear, it has no ---- it will not assist with respect to the Riverside case in light of the application of Penholtzer. It is our position that both requirements articulated by the High Court in Ryan clearly apply to pre-AEDPA cases. The requirement that a claim substantially benefit from the participation of the Petitioner, as well as the likelihood that the Petitioner would regain competency in the foreseeable future, would apply no less in a pre-AEDPA setting. Well, assuming that to be the case, but with a little less urgency on, perhaps, on the timeliness question, because there's no absolute deadline, and more likelihood of non-record-based claims because of the absence of Penholtzer, how does it apply to this case? Well, in this case, as you note, certainly it would be a much more rigorous standard to apply if Penholtzer applied. But nevertheless, in the context of this case, there's no indication whatsoever that Mr. Medina could in any way substantially assist any claim. There were three claims that were refused. Well, what about the fact that he apparently has, from the beginning, refused ---- I mean, at some point he just closed down with regard to the willingness to cooperate with any testing, and in particular, there's been a great advance in, you know, neuroscience in terms of brain function testing, and he's never ---- and he's been, I gather, although it's not that clear on the record, just flatly refused to have anything to do with it. Well, Mr. Medina's cooperation is selective. It waxes and wanes depending upon the circumstances. That's a different issue. That's as to whether he's really incompetent or really isn't incompetent, but that doesn't quite ---- that's not directed at the question of whether we ought to find out whether he's currently competent, at least for this purpose. Well, I would say that this case presents probably the most comprehensive and certainly the largest number of mental health experts that ---- Pending when? When was the last time anybody tested him or spoke to him or did any analysis of him? Well, since it's been pending on appeal in this Court since 2009, and the district court resolved the issue in 2008. But I thought that the last actual attempts to ---- that anybody actually got ---- dealt with him was in the early 90s or mid-90s. It would be in the 94 to 97 range. Right. But in terms of whether or not ---- And not for lack of trying. Well, in terms of whether or not Judge Liu abused his discretion, he most assuredly did not. And as Judge Liu fully appreciated, the issues that he was resolving in both cases, independent of the current mental competency claims, all bore on the appropriate disposition of both the motion to stay and the motion for further evidentiary development to support a hearing. But how did they bear on it when they were necessarily backwards looking to the period 2001, not 2014? Because there is an overarching concern, which is, is Mr. Medina unable or unwilling to cooperate? Which is not necessarily, you know, one who, as you know, with regard to mental health issues, a static answer. Well, that was ---- that point was made by Amicus. But again, having the benefit of a mental health history that dates back to the 70s, there are clear patterns that emerge with respect to Mr. Medina. There is a pattern of selective cooperation with experts, depending on whether or not they are confidential and appointed to assist the defense, or whether they are under appointment by the court itself. That was evident with Dr. Sharma, who was initially appointed in this case as a pretrial confidential defense attorney. But even now, when they ---- the most recent declarations seem to say that when they went there with his lawyer and a psychologist person, they wouldn't talk, they wouldn't deal with him. There were a number of experts who examined Mr. Medina at the behest of habeas counsel, many of whom he cooperated with. And ending around 94, 95. Yes, in the same time frame. And sometimes he cooperated and sometimes he didn't. And as Dr. Thomas Apley noted, he was tired of doctors. And what's important in terms of assessing counsel's request for a remand or further proceedings, and an opportunity to assess his client's current competency, is, first of all, we have the benefit from the United States Supreme Court, which tells us that Mr. Medina enjoys no right to current mental competency for purposes of federal habeas corpus or for purposes of appealing from the denial of federal habeas corpus. So a remand in order to ascertain his current competency would be in excess of the jurisdiction of an Article III court. But wait a minute. That's not what the Supreme Court said. The Supreme Court gave the outlier for staying a Federal proceeding in order to inquire of the petitioner himself. And while the Supreme Court has not foreclosed altogether the exercise of judicial discretion by a district court, when faced with a situation where a petitioner is unable but needing to substantially contribute to a claim that's being adjudicated, for example, if a district court had a petitioner who suddenly suffered a stroke in the past, that that court lacked the inherent power to enter a stay of those proceedings until such time as it could be ascertained whether or not the petitioner could cooperate and participate in the near future. But as the high court recognized, the state has a right to defend its judgment and to And I would suggest on the record that is before the Court, it is resoundingly clear that Judge Liu did not abuse his discretion. As he aptly appreciated, there was no reason for him to resolve Claim 20 in the Orange County case, or Claim 1 in the Orange County case, or Claim 2 in the Orange County case, or Claim 1 in the Riverside County case, which alleged current mental incompetency, in advance of his due consideration of all the mental health issues pending in both cases. And in resolving those issues and considering the myriad of psychiatric evidence and opinions throughout trial and from habeas counsel, Judge Liu made a finding. He concluded that Medina is unwilling, as opposed to unable, to assist counsel or in psychiatric evaluation. As of when? At all times, Your Honor. Mr. Medina's counsel have insisted that he was mentally incompetent, legally insane, brain damaged, mentally retarded, and neurologically impaired before, during, and after his crimes. And with the help of the extensive psychiatric history dating back to his incarceration first in California prisons, subsequently in Arizona prisons, it is resoundingly clear that Mr. Medina is a malingering sociopath. And this explains the selective cooperation, the periods of time in which he declines to cooperate. Indeed, as Dr. Sharma and Dr. Morrill noted, Mr. Medina shows no decline or improvement depending upon whether he is medicated. This is extremely significant since he is claiming to be schizophrenic. Yet, when Dr. Morrill examined him as a confidential defense expert, where Mr. Medina cooperated extensively, he noted that Mr. Medina had not received any medication for five months prior to being evaluated by Dr. Morrill, an eminent, highly qualified psychiatrist who opined that Mr. Medina is both mentally competent, not brain damaged, and indeed is an antisocial malingerer. And so it's with the benefit of this extensive medical history and a number of experts, frankly, when Mr. Medina presented in the Arizona prison, it was very similar to when he was being first presented at the Orange County jail. He was initially diagnosed by Dr. Gold as a paranoid schizophrenic. But once he was confined to a hospital setting where he nearly escaped but for a recent weight gain, he was examined and observed for a number of days. Is that in the record? Yes. That's in the record? Oh, yes. Where? Well, it's in my brief. That's not the record. Well, I apologize, Your Honor. I don't have the page number. Okay. But I'm sure you're aware that the record spans thousands of pages. I have a chart. No, I'm well aware of that. It's in there. It spans the record. Okay. All right. We'll take your brief. We'll take it. I apologize for not having a citation, but Mr. Medina is a person who is capable of manipulating mental health professionals to advantage, and he has on occasion tried to get into a hospital setting because it is less secure. He has escaped from courtrooms. He has attempted to escape from the Arizona State Hospital. So here's what I have in your brief. A recent weight gain prevented Medina from making good his escape. Record of transcript 449. Is that what you are? Yes. That's what I was referencing, Your Honor. All right. But the important thing to note is that when he arrived at the Arizona State Prison, he was seen by Dr. Gold, who is a treating psychiatrist. And as Dr. Thomas, who is one of Mr. Medina's experts, pointed out, those who treat are advocates. They are different from those who evaluate. And when Mr. Medina was placed into a hospital setting, he was evaluated by no less than one of the founding fathers of forensic psychiatrists. This eminent psychiatrist, he identified Mr. Medina as an antisocial personality disorder, malingering. They also insisted he be returned to the prison because of his extreme violence. When Mr. Medina arrived in the Orange County Jail, his initial working diagnosis was schizophrenia. But within a week, with the benefit of his extensive psychiatric history, with the benefit of observing him 24-7 and communicating with him, the diagnosis once again changed to antisocial personality disorder. So the fact that Mr. Medina on occasion is unwilling to cooperate with testing is unsurprising. It also does not help him. And with respect to the importance of what we know from the record, we know that a child psychiatrist retained by Habeas Council has said there is no evidence of neurological impairment, no learning disabilities. We have the fact that he had normal EEG, CAT scan, skull X-rays, and psychological testing after his crime spree. We know that his difficult birth and other childhood injuries did not result in long-term damage affecting his intellectual development. And we know that because he graduated from a public high school and he successfully attended college for one year. His IQ at the age of 25 was 108. We know from Dr. Morrill that he is influent in at least two languages, if not four. We know that Dr. Morrill considers him to be of above-average intelligence. And it is important to look at this 30-year history. We have Dr. Rivlin administering a neurological exam as early as 1966. And while I will concede that Dr. Pincus is unimpressed with anyone else's neurological examinations, the record is replete with evidence contradicting all of the allegations that Mr. Medina has organic brain damage or is so profoundly mentally ill that he cannot assist his counsel or cooperate with examinations. Well, there's also some evidence to the contrary, certainly with regard to the schizophrenia, to some degree with regard to the neurological impairment, at least some evidence. So ultimately we're relying on a finding by Judge Liu, is that right, as to the current situation? Yes. We are relying on the findings of Judge Liu, which are supported not merely by substantial evidence, but by overwhelming evidence. And there is absolutely no clear and convincing evidence to overcome Judge Liu's findings. Now, with respect to the evidence that would suggest that there's some neurological impairments, even habeas counsel's experts are quite candid that this is minor neurological impairments. We have some limited executive functioning. Nothing of the sort that would counsel for further inquiry, let alone lead to any relief. Again, Dr. Morrill's assessment is very compelling, both because Mr. Medina cooperated. It was bilingual, as Dr. Morrill and Mr. Medina both speak Spanish. Can you tell me exactly where the finding by Judge Liu is that you're relying on? It specifically states in the opinion. In which order? Not the order specifically on this, but the Orange County's? Long order. Long order. Yes. In the Orange County order, he specifically states that Teofilo Medina is unwilling as opposed to unable to cooperate with mental health experts. Currently. Yes. Well, yes. Well, impliedly, in denying Claim 20, I can't recall it. I'd just like to show me where it is, that's all. I believe it is in the discussion under Claim 20. If it's not, it's in one of the discussions of the many other mental health issues that have been raised. If you're relying on a specific fact finding, it would be nice to read it. But I don't want to delay. I can certainly provide the citation subsequently. And again, I apologize. So the discussion of Claim 20 begins on page 184. Does that help you? Well, I don't, again, that there are several hundred pages just for the rulings of the district court. I do not have them all at the podium with me. You can give a citation later. Yes. I'm confident it's there. I read it last night. But I don't have it in front of me today. But again, one of the reasons that the holding in Ryan v. Gonzales applies in pre-AEDPA cases is significant. And that is because the concern of the high court in Ryan was with delaying the state's opportunity to defend its presumptively valid final judgments. Any case that is in a pre-AEDPA posture is at least 18 years old. Mr. Medina's Orange County case will have been pending in the federal courts for 20 years at the end of this month. And it is against that backdrop that we indicate that there is no good cause to remand these proceedings to permit Judge Liu to allow for counsel to attempt to see if Mr. Medina will cooperate with further psychiatric and psychological testing if he is medicated. Mr. Medina has been medicated off and on for over three decades. Has he been? Do we know whether he's been involuntarily or voluntarily medicated? Currently. I do not. Currently or at any point has he been involuntarily medicated? Involuntarily medicated? I'm not aware of any, but I have not inquired. And what medications has he been on, if you know? Well, there's a lengthy discussion with respect to his administration of Thorazine coming into the Riverside County trial. There's discussion by several of the experts that Mr. Medina preferred certain types of tranquilizers and that Mr. Medina would essentially dictate what medications he wanted to take in a custodial setting. So there are those discussions. So let me ask you, your opposing counsel suggested he could make a motion somewhere to get forced medication so that he could determine whether Medina could provide him with assistance in his any one of his claims. Is there some other avenue available? Or do you or just I'm asking about state procedure. Do you wait for the execution to be scheduled and then you go through all this? I can only address what's available in the context of challenging his state court conviction. I honestly don't know what's available to him in terms of advocating for his client as an inmate. Which is a separate matter. But with respect to these proceedings, what is available is to litigate when it becomes right, competency to be executed. There is no basis for any motions or inquiries as to competency or otherwise at this juncture in these proceedings. Judge Liu did not abuse his discretion. Frankly, this case is in apposite to the procedural posture of Ryan in the first place. Because it wasn't a situation where competency was not already an issue. And additionally, it would have been an abuse of discretion to stay proceedings when Judge Liu determined that Petitioner had not made any showing of present mental incompetency. Indeed, when you look at the showing that's being offered, it's not enough. But what I'm wondering is whether he made, and this is why I would like to see it. My vague recollection, or not so vague recollection, is that he basically said that the same facts that go to his competency during the trial demonstrate that he's competent. Now, but that's not a very convincing or even, I would say, deferrable to a conclusion, because it's not about current competency. In some cases, I could see where it would be in. Is that what he said, essentially? I mean, since neither of us seem to know exactly where he said it, it makes it hard to know what he said. But I do know what he said. He said that Teofilo Medina is unwilling. Is or was? Is. You have to know. Based on what? Based on what was? Based on a 30-year history of malingering. It's not useful to argue with me. I mean, I'm trying to understand what he actually said. And if you knew where it was and I could look at it, it would be one thing, but you don't. I understand that in some cases it could be an entirely different inquiry as to present competency versus competency 20, 30 years ago. Correct. But when you're dealing with a malingering sociopath. So what? He could have been a malingering sociopath 30 years ago, and now he could be incompetent and insane. It could be. I mean, it could be, right? Well, I believe the high court has told us that he has no statutory or constitutional right to current competency. Well, that's right. But you have his lawyers coming in saying we absolutely cannot communicate with him. We've brought medical people to see him. He won't talk to them. I mean, the district judge would be, you know, would have authority to conclude that there's no issue there, but he would have to decide it not based on 30 years' old evidence. Well, he would have to first find what is the issue that the Petitioner could suggest. Well, that is true, and that's what I was trying to make a point for. Well, ironically, the issues at hand were a Marsden motion, which he can't assist with because it's based entirely on the record that was before the court when the court is alleged to have abused its discretion. There's this Shackling issue, which is solely limited to whether or not the court abused its discretion in finding a manifest necessity to use restraints on an individual who had escaped from custody and been violent in custodial settings and courtrooms before. So we don't need Mr. Medina's substantial contribution to that claim. And then that leaves his mental competency issues, which theoretically he shouldn't be able to assist on if he indeed is the profoundly brain-damaged, mentally retarded, mentally ill person that he's alleged to be. And with respect to his family history as evidence in mitigation, we can't expect him to contribute on that, since he clearly viewed his family in a different light than habeas counsel. Counsel, can I ask you that when you say the district court found that he was a malingering sociopath, are you relying on this language here where the district court says, even more importantly, Medina cites no clear evidence to show that he is actually mentally incapable of cooperating with Federal habeas counsel? That's among the many references. Yes, it's his burden to show, and he did not meet his burden. Right. But that's not the same thing as a finding of that he's a malingering sociopath. It's just that he didn't introduce clear evidence to show that he's actually mentally incapable. The decision is extremely lengthy, and in the discussion about opening the door to mitigation evidence, one of the concerns about taking the tact that Federal habeas counsel urges with benefit of hindsight is that it would have opened the door to very damaging testimony about Medina abusing animals as a child, and the fact that the overwhelming majority of psychiatrists who have examined him do consider him to be a sociopath and the adverse implications that would have. Okay. Well, I just want to say, so the reason the district court exercised its discretion to deny was because Medina didn't show any clear evidence. And part of what I hear your opposing counsel argue is that he couldn't gather that evidence because what he needed to do was test him today to show whether he was actually mentally capable or not of cooperating. He is saying that he needs yet another opportunity. The opportunities he had for over 10 years in the district court to have a myriad of experts examine Mr. Medina is, in his opinion, not sufficient. I would suggest that the State of California has a right to enforce its judgment and to defend its judgment. And the high court has made plain that it is not appropriate. You know, you're just repeating yourself. You've said that those particular two sentences about five times by my count. My apologies, Your Honor. Yeah, right. But you don't need to do that. It just takes up time unnecessarily. But I understand what you're saying. You're saying he had the opportunity to gather that evidence, and he either failed to do it or he couldn't. That's what you're saying, right? I'm saying he was unwilling not to. No, you're saying that your opposing counsel had the opportunity during the course of these proceedings to obtain that evidence that he wants to obtain now, but he either could not obtain it or he failed to obtain it. Yes. And ironically, that's what he's criticizing. Yeah, I gather that. The reason I was asking about involuntary medication is that when the question is competence to be tried, to begin with, the government can and often does have people seen by these places, Springfield, Missouri, is that where it is, or wherever it is, and someplace in Maryland, and which can then essentially, with appropriate procedures, provide involuntary medication and make the person competent, perhaps. Is that the – I gather that that's essentially the stature that was at issue in Ryan, at least the second – and at least in part, and they said it's not applicable on habeas. Is that right? That's correct. And I would point out that Mr. Medina was afforded a full competency hearing, and that was heard on the merits. I understand that's about trial, but I'm asking whether if, in fact, he were incompetent right now, would there be any way to compel medication? I mean, could the government do it? Could they do it? Could anybody do it? There is no provision for restoration of sanity of competency for purposes of Federal habeas. That's what I'm trying to ascertain. There isn't. There is none. And that's clear from the high court's opinion in Ryan, where no statute or constitutional right addresses mental competency. You did answer about your last 30 seconds. Did you want to talk about anything else with us today? No, Your Honor. All right. Thank you. Thank you. Thank you. to read Claim 20, Competence to Assist in Habeas, that Judge Liu penned back in 2008, and it's on pages 184 to 186 of his order of June 16, 2008. I read it. I reread it. I do not find the word unwilling anywhere in that conversation. I believe Judge Wardlaw picked out a sentence and discussed it with Mrs. Wilkins, but I don't think that has anything to do with what we had filed. Dr. Gold, in the 70s, said he was a paranoid schizophrenic. Dr. Sharma, in questioning by me, said he had a broken brain. And Dr. Klatt is recited in detail by Judge Liu on page 32 of his order. I don't know the transcript. And in it, Dr. Klatt explained, quote, in his prison records, about half the time he was diagnosed as antisocial, personality disturbance, and half the time as paranoid schizophrenia. I could see evidence of both. Plus the fact that there is outside evidence that the brother did die and committed suicide, was suffering from paranoid schizophrenia, so probably he has a genetic tendency in that direction, which is at reporter's transcript 6886287. Dr. Klatt also acknowledged that Medina's brother was suffering and that his pattern and behavior was similar to Medina's behavior at reporter's transcript 6881. I have seven seconds. I would simply say that I foresee a clash between the Ryan case that just came down and Ford v. Wainwright based on the questioning by the judges. I don't have any time left, but if I were to ask a question as to why do I see a problem, the problem is that you can't ever try to medicate him to see if he can assist you, because it seems to me that you could then medicate him for the purposes of killing him. And so it seems to me that people would want to prevent going in to medicate someone to be able to then have the evidence thrown at them by the state attorney general that yes, we can now medicate him for the purposes of execution. I see the conundrum. And so I'm now simply saying... But that's also your risk. I understand, but I still want the opportunity. I've met with Junior Medina now maybe 20, 30 times. All of my billing records show it. I've taken other counsel with me that worked with me. I've taken experts with me. I've taken paralegals with me. We've submitted declarations, as did former counsel Mr. Abzug in Medina too, that he can't help us. I just simply make a simple point. Judge Liu, who I have the greatest respect for, did not describe his ruling under the substantial benefit text. If it were remanded to him, he may come right out and say exactly the same thing under Ryan, under the Ryan decision. But by the same token, he did not find that there was overwhelming evidence. He did not find that Junior Medina was a malingerer with sociopathic tendencies, and he did not find that Junior Medina was unwilling, et cetera, to have people there. Thank you, counsel. The case is heard and will be submitted for decision, and we'll proceed to argument in Medina 2.
judges: Thomas, Wardlaw, Berzon